UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN KEOGH, D.O.,

        Plaintiff,

                                     Case No. 16-CV-11460

vs.

                                     HON. GEORGE CARAM STEEH

CONCENTRA CORP.,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [DOC. 21]

Plaintiff Dr. Kevin Keogh filed this action alleging discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* against his employer, defendant Concentra. The matter is presently before the court on defendant's motion for summary judgment.

The court held oral argument on defendant's motion on August 23, 2017. For the reasons set forth below, defendant's motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

1.    Dr. Keogh's Employment at Concentra

Concentra provides occupational healthcare services dedicated to the treatment of workplace injuries and the performance of employment-related healthcare services, such as drug screenings and pre-employment physicals.  Dr. Keogh began his employment as a physician for Concentra in 1993 when he sold his medical practice to Concentra.  Dr. Keogh worked as a Staff Physician, first in the I-96 Center in Novi and later in the Livonia Center.  In 2001, Concentra promoted Dr. Keogh to Center Medical Director (CMD) for the Livonia Center.  As CMD, Dr. Keogh's responsibilities included patient care as well as leadership/management. CMD's reported directly to the Area Medical Director (AMD).  Concentra's core operational principles are found in its Site Playbook.  The Site Playbook establishes standardized processes to ensure that an individual has the same experience in all Concentra locations.

In 2010 Dr. Keogh had his first back surgery, a laminectomy for herniated discs at levels L4 and L5.  He had a second laminectomy for the same discs in 2012, developed an infection and underwent a subsequent fusion.   Dr. Keogh returned to work in February of 2013.  Dr. Keogh

contends he had difficulty sitting, going from sitting to standing, and walking for long periods due to his surgeries. As a result of pain and other limitations, Dr. Keogh maintains that he got fatigued after working for more than 6 hours.

2.  Events Leading to Dr. Keogh's Demotion

In mid-2013, Dr. Thomas became the AMD who directly supervised Dr. Keogh as the CMD of the Livonia Center. In 2014, Dr. Thomas developed concerns about Dr. Keogh's performance and addressed performance and behavioral problems related to his leadership. On February 14, 2014, Dr. Thomas noted that Dr. Keogh made fun of the Playbook. On February 26, 2014, Dr. Thomas met with Dr. Keogh about his attendance at the mandatory quarterly staff meeting. Dr. Keogh said he would "think about" attending. On March 4, 2014, Dr. Keogh told Dr. Thomas he would not attend the mandatory quarterly meeting because "if it's not about medicine I don't have anything to do with it." (Ex. 15, Dr. Thomas' Counseling Notes).

At the March 4, 2014 meeting, where the Site Playbook was rolled out to staff at the Livonia Center, Dr. Keogh spent the first 70 minutes of the 90 minute meeting working in another room. When asked to sign his

pledge agreeing to adhere to the principles of the Site Playbook, Dr. Keogh signed the name "Wiley E. Coyote."

Dr. Thomas informed Dr. Cobb, a Regional Medical Director, of Dr. Keogh's insubordination. Dr. Cobb forwarded the information to Dr. Yaldo, Concentra's Vice President of Medical Operations, Dr. Cobb expressed her support "of making a move to separate Dr. Keogh" to Senior HR Consultant Thomas Tschirhart.

Concentra placed Dr. Keogh on a PIP on March 11, 2014 for unsatisfactory performance:

(1)    Openly mocking Concentra's policies and procedures;

(2)    Not consistently completing charts in a timely fashion;

(3)    Not participating in the management of the Livonia Center staff;

(4)    Consistently arriving late for meetings;

(5)    Engaging in rude and disrespectful behavior in meetings, such as addressing the group with "Hi Ladies and Genitals";

(6)    Failing to take Livonia Center performance metrics seriously; and

(7)    Not taking responsibility for center readiness audits ("CAT Audits").

The PIP required Dr. Keogh to correct his deficiencies and meet expectations within 30 days.  While on the PIP, Dr. Keogh refused to see a patient for a physical exam because the patient arrived 15 minutes before closing and Dr. Keogh did not want to delay the end of his shift.  This conduct was in contravention of Concentra's policy of requiring that all patients arriving at a clinic before closing are seen.  Also while on the PIP, Dr. Keogh arrived over a half-hour late for his shift.  A patient presented with an urgent medical need, which required Concentra to call EMS.

On April 17, 2014, Dr. Keogh met with Dr. Thomas to discuss his progress towards meeting the targets of the PIP.  After 30 days on the PIP, Dr. Keogh was still not completing charts on time, had not performed any mock CAT Audits, and refused to see patients who arrived near the end of the day.  Dr. Thomas noted that "Dr. Keogh takes excellent care of his patients, but has room to grow regarding leadership and administrative elements of the CMD position."  Dr. Thomas extended the PIP to afford Dr. Keogh another opportunity to correct his performance problems.

The next month, on June 14, 2014, Dr. Thomas met with Dr. Keogh to discuss his performance.  Dr. Keogh had satisfied some but not all of the

requirements of the PIP, so Dr. Thomas decided to close the PIP rather than placing Dr. Keogh on a Final Warning.

On July 7, 2014, Dr. Thomas emailed Dr. Keogh, telling him to complete two mandatory learning modules by July 11, 2014 to avoid being taken off the schedule. On July 16, Dr. Thomas again emailed Dr. Keogh telling him he must complete the two learning modules and asking for an explanation as to why he has not yet completed them. The same date, Dr. Thomas informed Dr. Cobb of the situation and asked for her support in following through with taking Dr. Keogh off the schedule the following week. On July 17, Dr. Cobb informed Dr. Yaldo that Dr. Keogh would be removed from duty if he did not comply with the training.

On July 28, Dr. Thomas emailed Drs. Cobb and Yaldo to inform them that she would like to move Dr. Keogh out of the CMD role and offer him a full time float position. "If he declines this position then I do not have a place for him." (Ex. 28, July 28, 2014 email) Drs. Cobb and Yaldo agreed with Dr. Thomas' proposed course of action. On August 11, 2014, Concentra reassigned Dr. Keogh from his position as CMD of the Livonia Center to that of a float physician. Dr. Keogh no longer had leadership responsibilities and received assignments to work at clinics within the

market based on the need for physician coverage.  Dr. Keogh's salary was not reduced even though he no longer performed the duties of a CMD.

3.   Post-Demotion Events

On August 27, 2014, following Dr. Keogh's demotion to float position, Dr. Thomas visited the Livonia Center where Dr. Keogh was working.  Dr. Thomas learned that Dr. Keogh showed up at least a half hour late for his shift three days that week and did not answer a routine question asked by a medical assistant.  Dr. Thomas met with Dr. Keogh and stated her expectation that he be on time to work and perform his duties in a professional manner.  Dr. Thomas summarized problems with Dr. Keogh's unprofessional behavior in an email to Drs. Cobb and Yaldo and Thomas Tschirhart, writing that she would return to the Livonia Center in 5 days and that "if this behavior persists at that time, I will be requesting a panel call to separate Dr. Keogh from Concentra."

Concentra's FMLA leave policy required employees to contact a third-party administrator.  Dr. Keogh testified that he knew about this requirement.  Prior to his demotion to float physician, Dr. Keogh testified that he never contacted the third-party administrator or said anything to Dr. Thomas or his other supervisors about needing FMLA leave or an

accommodation. (Keogh dep. pp. 102-03). During Dr. Thomas' August 27, 2014 visit to the Livonia Center, Dr. Keogh told Dr. Thomas he wanted to obtain information regarding potential FMLA intermittent leave or accommodations because of his chronic back condition. (Keogh dep., pp. 106-08, 142-43) Dr. Keogh testified that he did not tell Dr. Thomas he wanted to take leave or wanted to receive an accommodation, rather he was "just seeking out information at that time." Dr. Thomas told Dr. Keogh to contact Tschirhart in Human Resources regarding his inquiry.

On August 28, 2014, Dr. Keogh reported to work one hour late without offering any excuse. Dr. Thomas gave Dr. Keogh a Final Verbal Warning, which she documented in writing on August 29, 2014. The Warning directed Dr. Keogh to: (1) be on time to work every day; (2) be respectful to everyone; (3) refrain from outbursts; (4) not make derogatory comments about Concentra; and (5) implement Concentra's clinical support model. According to Dr. Thomas, Dr. Keogh stated that he understood he could be terminated if he did not immediately live up to the expectations described in the Final Verbal Warning. (Ex. 31, Dr. Thomas August 28, 2014 email).

On September 3, 2014, Dr. Keogh reported late for work because he forgot his clothes after going to the gym. On September 4, 2014, Dr. Thomas sent copies of her documentation regarding Dr. Keogh's performance deficiencies and attitude issues to Dr. Yaldo so he could evaluate whether to approve convening a panel call to discuss the possibility of terminating Dr. Keogh.

On September 5, 2014, Dr. Keogh arrived late for his shift without calling to inform the clinic and without providing a reason for his tardiness. In an email to Tschirhart and Drs. Cobb and Yaldo, Dr. Thomas remarked that Dr. Keogh "has not been punctual any day since our discussion regarding him taking the full time float position. This is having a negative impact on patient care and colleague morale." (Ex. 35). On September 6, 2014, Dr. Cobb called for separation consideration and a panel call.

Meanwhile, Dr. Keogh contends that he met with his orthopedic surgeon, Dr. Montgomery, on September 3, 2014. He told his doctor that he preferred an accommodation with a stand-up work area as well as an 8 hour work day. The doctor agreed to assist Dr. Keogh once he decided what he wanted to do.

Dr. Keogh testified that he left Tschirhart a voice message on September 5, and then spoke with Tschirhart on September 8, 2014 to request information regarding intermittent FMLA leave or an accommodation. Dr. Keogh admitted he did not make a specific request for an accommodation or leave, but did tell Tschirhart he wanted to be assigned to clinics where he could stand to perform charting requirements and that he wanted to work an eight hour day. Dr. Keogh acknowledged that the Livonia center computers were at a height at which he could stand to perform charting, and that while the 96 Center had counters at standing height, the computer was on a desk at sitting height. (Keogh dep. pp. 140-142). Tschirhart told Dr. Keogh that he would look into his request and to "sit tight."

Concentra convened a panel call on September 12, 2014 to evaluate whether to terminate Dr. Keogh. Present at the panel call were: Dr. Cobb, Dr. Yaldo, an in-house Concentra attorney, Tschirhart, Jenny Patkowa (Tschirhart's supervisor), and Concentra's Chief Medical Officer. Dr. Keogh's request for a standing work station and an eight hour day was brought up at the panel call. (Tschirhart dep. p. 84). A consensus decision

was made to terminate Dr. Keogh.  Dr. Keogh was informed of his termination in person that same day.

Dr. Keogh accepted a position at Advance Urgent Care in or around October of 2014.  He testified that he worked 12 hours a day, three days a week while he was employed there.  (Keogh dep. p. 114).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations

or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

ANALYSIS

I. <u>FMLA Interference</u>

To establish a prima facie case of FMLA interference, a plaintiff must show that: (1) he was an eligible employee; (2) defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take leave; and (5) his employer denied him FMLA benefits to which he was entitled. *Donald v. Sybra Inc.*, 667 F.3d 757 (6th Cir. 2012). Defendant argues that plaintiff cannot satisfy the fourth or fifth elements of his prima facie case.

For an employee "[t]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Reeder v. County of Wayne*, 177 F.Supp.3d 1059, 1071 (E.D. Mich. 2016). An employee seeking FMLA leave does not have to expressly refer to the statute, "but [he] must convey enough information to apprise

[his] employer that [he] is requesting leave for a serious health condition that renders [him] unable to perform [his] job." *Norton v. LTCH*, 620 Fed.Appx. 408, 410-11 (6th Cir. 2015).  In *Reeder*, the plaintiff delivered three notes to his employer from his healthcare providers certifying that he was subject to a serious health condition rendering him unable to work more than 8 hours per day.  The notes were delivered in response to disciplinary actions taken because plaintiff refused to work overtime hours. The burden is on the employee to show that he put his employer on notice of his intention to take leave under the FMLA.  The *Reeder* court found plaintiff submitted sufficient evidence to create a genuine issue of material fact whether the employer was on notice of its duty to inquire further about whether FMLA leave was being sought.

In this case, Dr. Keogh described his status as "investigating" the possibility of taking FMLA leave when he spoke to Dr. Thomas on August 27, 2014 and Mr. Tschirhart on September 8, 2014.  (Keogh dep. p. 138). Where Dr. Keogh is only asking questions about how intermittent FMLA leave works, and stating his desire for an eight hour work day without directly requesting leave and without providing medical certification of a need for leave, it is insufficient to create an issue of fact that his employer

was on notice that FMLA leave was being sought. Because the evidence in this case does not support more than this, plaintiff has not established a prima facie case of FMLA interference.

Even if Dr. Keogh did make out a prima facie case of FMLA interference, his claim would not survive summary judgment because he cannot establish that Concentra's proffered, and well-documented, business decision to terminate him was merely a pretext for FMLA discrimination. Pretext is demonstrated by showing that the proffered business reason underpinning a plaintiff's termination "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). To establish pretext at the summary judgment phase "a plaintiff must produce sufficient evidence from which a jury could reasonably reject the employer's explanation for the adverse employment action." *Dekarske v. Federal Express Corp.*, 294 F.R.D. 68, 81 (E.D. Mich. 2013).

Dr. Keogh acknowledges that he was given a Final Verbal Warning on August 28, 2014, that included the issue of his tardiness. In response, Dr. Keogh argues that tardiness was generally excused from other

clinicians. In support, he cites to the deposition of Suzy Francoeur, who testified that she was permitted to be late to work regularly because she was willing to work at a hard-to-staff location where "you can get away with pretty much anything without getting in trouble." (Francoeur dep. p. 121). Ms. Francoeur is a PA, not a physician.

However, the undisputed evidence shows that Concentra terminated Dr. Keogh only after he failed to correct his numerous and well-documented ongoing performance and behavioral issues. Second, there is nothing specific in the record that suggests the decision to terminate Dr. Keogh was motivated by anything other than his post-Final Warning tardiness. Third, the record demonstrates that Concentra afforded Dr. Keogh numerous opportunities to improve before terminating him. Even when faced with the reasons Concentra identified for terminating him, Dr. Keogh never related any of those reasons to his back issues. Dr. Keogh fails to support his argument that his termination was pretext for FMLA discrimination.

Concentra's motion for summary judgment on Dr. Keogh's FMLA interference claim is GRANTED.

II.  FMLA Retaliation

To establish a prima facie case of FMLA retaliation, plaintiff must show that (1) he was engaged in an activity protected by the FMLA; (2) his employer knew that he was exercising his rights under the FMLA; (3) after learning of plaintiff's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

Dr. Keogh identifies his FMLA protected activity as being his notifying his supervisor on August 27, 2014 and a senior Human Resources employee on September 5 and 8 that he wanted to investigate the possibility of taking intermittent leave because he found working a nine hour shift difficult due to his chronic back injury.  (Brief pp. 17-18).  Dr. Keogh argues that he satisfies the causal connection requirement because he was terminated within days of making his inquiries.

The Sixth Circuit "is clear that temporal proximity cannot be the sole basis for finding pretext.  *Donald*, 667 F.3d at 763 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)).  Yet, temporal proximity is all that Dr. Keogh argues.  He never tied his tardiness issues to

his back pain and he was equivocal in asking for intermittent FMLA leave because, by his own admission, he was only investigating the possibility.

Looking at the evidence in the light most favorable to plaintiff, Dr. Keogh does not satisfy the causal connection element of his prima facie case of FMLA retaliation. For that reason, defendant's motion for summary judgment is GRANTED.

III. ADA Disability Discrimination

To establish a prima facie case of discrimination under the ADA, Dr. Keogh must prove that: (1) he has a disability; (2) he is otherwise qualified for his job with or without reasonable accommodations; 3) Concentra disciplined, demoted or discharged him solely because of his disability; 4) Concentra knew or had reason to know of Dr. Keogh's disability and 5) "the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (citations omitted). The plaintiff's disability must be a "but-for" cause of his discipline, demotion or termination to meet the third element. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (giving the history of why the court applies the "but-for" causation test instead of the "motivating factor test" to the ADA).

The issue comes down to whether Dr. Keogh's disability, identified as his chronic back problem, was the "but-for" cause of his termination. Concentra argues that the evidence demonstrates that Dr. Keogh's thoroughly documented behavioral and tardiness issues both impacted his performance and lead to his termination. The decision to terminate Dr. Keogh followed his demotion to float physician, a series of oral and written warnings due to his unprofessional behavior and tardiness, and his failure to improve his identified deficiencies.

Dr. Keogh offered explanations for two occasions when he was tardy – blaming them on the location of his residence and the failure to bring proper clothing to the gym – neither of which were related to his identified disability. For all other times he was tardy, he gave no explanation at all. Other than the timing of his request for a standing option to complete his charts and a reduced work schedule, there is no evidence to support Dr. Keogh's contention that but-for making such requests, he would not have been terminated.

Dr. Keogh has failed to establish a prima facie case of disability discrimination under the ADA. Defendant's motion for summary judgment is GRANTED.

IV. <u>ADA Failure to Accommodate</u>

To establish a prima facie case of failure to accommodate, Dr. Keogh must show that: (1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) Concentra knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) Concentra failed to provide the reasonable accommodation. *Deister v. AAA Auto Club of Mich.*, 91 F.Supp.3d 905, 922 (E.D. Mich. 2015). Dr. Keogh maintains Concentra failed to grant his requests for the following accommodations after he was demoted to float physician: (1) that he only receive assignments to centers where there were stand up work stations and (2) that Concentra allow him to work a reduced hour schedule. The focus is on the fourth and fifth elements of the prima facie case.

Following his back surgery in 2013, Concentra provided Dr. Keogh with an accommodation of working only with other medical providers present. Dr. Keogh knew first-hand how to seek an accommodation from Concentra. Furthermore, as a specialist in occupational medicine, one of Dr. Keogh's primary job responsibilities was to assess and recommend specific accommodations for his patients. Dr. Keogh did not even raise the

possibility of seeking an accommodation for his current back problems until late August 2014. He did not identify any specific potential accommodations of working at centers with the ability to stand and being assigned reduced hours until September 8, 2014 when he spoke to Tschirhart at Human Resources. This was more than a week after he received a Final Verbal Warning on August 28, 2014. Tschirhart testified he spoke about Dr. Keogh's accommodation request with his supervisor Patkowa. In fact, Concentra was only assigning Dr. Keogh to work as a float physician in centers that had stand up work stations. Dr. Keogh admitted that he did not require any accommodations with respect to his work station at the Livonia Center. As to the other center to which Dr. Keogh was assigned, the I-96 Center, Dr. Thomas testified that the counters were the same height as those at the Livonia Center and that a computer was moved to create a stand up work station for Dr. Keogh. (Thomas dep. p. 120). The evidence supports a finding that defendant did accommodate Dr. Keogh's request for a stand up work station.

Dr. Keogh contends that he also asked for a reduced work day of eight hours, where he would work from 8:00 to 4:00 instead of his present schedule of 8:00 to 5:00. Dr. Keogh did not provide his employer with a

doctor's note in support for his request, and was equivocal in his testimony regarding whether he made a clear request for an eight hour work day or whether he was still investigating his options. (Keogh dep. pp. 138, 141, 143). In order to satisfy the requirements of a prima facie case, a plaintiff must request an objectively reasonable accommodation. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). The only clear evidence in this case is that plaintiff was investigating his options with regard to shortening his hours. Therefore, plaintiff has not satisfied this element of his prima facie case for a failure to accommodate under the ADA. Defendant's motion for summary judgment is GRANTED.

V.  ADA Retaliation

To establish an ADA retaliation claim, Dr. Keogh must show: (1) that he engaged in a protected activity; (2) Concentra knew of that activity; (3) Concentra took an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Sharp v. Profitt*, 2016 WL 7468086 at *9.

Dr. Keogh identifies the protected activity he engaged in as his request for an accommodation from Dr. Thomas on August 27, 2014. He then reiterated his request in a message and follow-up conversation with

Tschirhart on September 5 and 8. The causation prong requires a plaintiff to show but-for causation. *Lewis*, 681 F.3d at 321.

As discussed in the previous sections, there is evidence in the record to support defendant's explanation that it terminated Dr. Keogh's employment because of his tardiness and insubordination. Other than the timing of Dr. Keogh's request for an accommodation, nothing in the record suggests a causal connection between his termination and any activity protected by the ADA. The law in the Sixth Circuit is that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Donald*, 667 F.3d at 763 (citing *Skrjanc*, 272 F.3d at 317)).

For these reasons, defendant's motion for summary judgment as to plaintiff's ADA retaliation claim is GRANTED.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED for the reasons stated in this opinion and order.

Dated: October 16, 2017

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 16, 2017, by electronic and/or ordinary mail.


s/Marcia Beauchemin
Deputy Clerk